

FILED
Sep 29 2015, 8:53 am
CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Yvonne M. Spillers<br>Fort Wayne, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana |
| | Robert J. Henke<br>Abigail R. Recker<br>Deputy Attorneys General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of:<br><br>N.G., L.C., and M.C. (Minor Children),<br><br>and<br><br>A.C. (Mother),<br><br>*Appellant-Respondent,*<br><br>      v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner* | September 29, 2015<br><br>Court of Appeals Case No.<br>02A04-1412-JT-605<br><br>Appeal from the Allen Superior Court<br><br>The Honorable Charles F. Pratt, Judge<br>The Honorable Thomas P. Boyer, Magistrate<br><br>Cause Nos. 02D08-1403-JT-22<br>           02D08-1403-JT-23<br>           02D08-1403-JT-24 |

**Baker, Judge.**

A.C. (Mother) appeals the judgment of the trial court terminating her parental rights as to her children N.G., L.C., and M.C. We reverse the trial court's judgment insofar as it relates to L.C. and M.C. as we find insufficient evidence to support it. However, we find that the trial court's judgment as to N.G. is supported by sufficient evidence and we affirm that portion of the judgment.

## Facts

Mother and J.G. (Father) have one son, N.G., born in 2003, and twin daughters, L.C. and M.C., born in 2006. At the time the trial court issued its judgment in this case, N.G. was eleven years old and L.C. and M.C. were eight years old. Mother has an older child, G.C., who is not involved in this case.

In 2011, Mother and Father were no longer married and were not living together. One day, while at the park with her children, Mother met D.H. (Boyfriend), who soon began living in Mother's home. Their relationship quickly took a turn for the worse when, less than six weeks later, police had to remove Boyfriend from the home because he had threatened to kill Mother. Police were called again a few weeks later to remove Boyfriend a second time. This time, there were concerns that Boyfriend had a gun.

On August 25, 2011, the Indiana Department of Child Services (DCS) filed a petition alleging all four of Mother's children to be children in need of services (CHINS). The trial court held a hearing on August 30, 2011. It found that,

while in Mother's care, N.G. had been struck with a belt that had metal prongs on it and had sustained cuts and bruising. The trial court took note of the fact that Mother blamed Boyfriend for the incident. However, it also noted that N.G. alleged that Mother had hit him with the belt as well as a wooden board. The trial court noted that, although Mother claimed to have ceased contact with Boyfriend, she admitted that he was waiting outside the courthouse that morning. The trial court found that this was not the first instance of Mother physically abusing N.G., as DCS had substantiated a previous claim in 2009.

[5] Turning to Mother's mental health, the trial court found that she had been diagnosed with bipolar disorder and had been prescribed medication, which she had not been taking. It also expressed concern that Mother may be a hypochondriac, citing the fact that all of her children were on multiple types of medication. In light of this, the trial court ordered N.G., L.C., and M.C. placed in the custody of their Father, who was at this point living with his new wife, K.G. (Stepmother). G.C. had previously been placed in foster care and the trial court ordered that this placement be continued.[1] The trial court ordered that any visitation between Mother and the children be supervised by DCS or an approved third party.

[6] On September 27, 2011, the trial court adjudicated the children as CHINS. The trial court held a dispositional hearing and found that Mother could benefit

---

[1] It is not clear from the record at what point or for what reason G.C. was placed in foster care.

from services that she would be unlikely to receive without the coercive intervention of the court. The trial court devised a parent participation plan and, among other things, ordered Mother to:

- Enroll in Whitington home-based services program . . . participate in all sessions and successfully complete the program.

- Enroll in individual counseling at Park Center . . . to include anger management, attend all sessions, and successfully complete the counseling program.

- Take all medications as prescribed.

- Obtain a psychiatric evaluation at Park Center . . . and follow the recommendations.

- Obtain a psychological evaluation at Park Center . . . and follow the recommendations.

- Refrain from physical discipline of your children at all times.

- Attend and appropriately participate in all visits with your children as directed.

State's Ex. 9 p. 3.

[7] On April 30, 2012, Mother completed a psychological and parenting evaluation with Dr. David Lombard at the Center for Applied Behavioral Studies in Fort Wayne. Regarding Mother's mental health, Dr. Lombard concluded:

[I]t is this psychologist's clinical opinion that [Mother] was displaying a symptom pattern consistent with the diagnoses of generalized anxiety disorder, bipolar disorder, victim of physical and sexual abuse, and impaired parent-child relationship. [Mother] reported that she had recently received the diagnosis of post-traumatic stress disorder. However, the current clinical interview and psychological testing does not support that diagnosis at this time.

It is recommended that she receive a combination of medication management and mental health counseling. She reported prior medication management for her bipolar disorder symptoms. It is recommended that she work with a psychiatrist to obtain proper medication for her bipolar disorder symptoms and her generalized anxiety disorder. It is this psychologist's clinical opinion that her history of being the victim of physical and sexual abuse has significantly affected her sense of safety and increased her paranoia. Proper medication will significantly reduce her generalized anxiety disorder symptoms while improving her depression and other mood disorder symptoms related to her bipolar disorder. Without proper medication, it is unlikely that she will be able to maintain a sense of stability in her personal, work, or social life.

It is recommended that [Mother] receive weekly mental health counseling sessions. It is recommended that she receive cognitive behavioral therapy to address her bipolar disorder symptom and her general anxiety disorder symptoms. Cognitive behavioral therapy has proven most effective in treating these conditions. It is also recommended that her individual mental health counselor address her history of physical and sexual abuse.

[Mother] reported significant difficulties parenting one of her children. She found [N.G.] to be particularly challenging and caused her significant parenting stress. Therefore, it is recommended that she receive individual parenting skills training to improve her interactions and perception of the child. It is also recommended that the two of them have family counseling sessions. Until she reduces her parenting stress regarding [N.G.], she will remain at high risk for inappropriate parenting with him.

State's Ex. 41 p. 7.

[8]     Mother began receiving home-based services in September 2011. Katie Reichert from Whitington began visiting Mother's home to help her work on budgeting and parenting. However, in March 2012, Reichert determined that Mother was not using the information given to her and, accordingly, "she was discharged for not benefitting from the services." Tr. p. 1006. DCS and

Whitington made another attempt at providing Mother with home-based services, this time sending Stacy Dickerson. Dickerson began meeting with Mother in August 2013 and the two worked on Mother's parenting skills. Mother fully participated in the services and successfully completed Dickerson's course in December 2013. Dickerson testified that she had no difficulty scheduling sessions with Mother and that she had observed Mother's home in a clean and safe condition. *Id.* at 365-66.

[9] Mother began participating in individual therapy in February 2012. She initially met with Vickie Heath from SCAN[2] for a six-month period. Heath worked with Mother on her parenting skills, focusing primarily on Mother's relationship with G.C. Mother was unable to regularly attend the sessions, due in part to the fact that Mother had fallen and broken her leg around this time, and she stopped meeting with Heath altogether in August 2012. Heath concluded that, due to Mother's sporadic attendance, she had not benefitted from the services.

[10] Mother continued individual therapy in October 2012, this time with Michael Wright from the Bowen Center. Wright attempted to assist Mother through the use of cognitive behavioral therapy. Early on in the therapy, Wright gave Mother a list of many examples of types of distorted thinking and their

---

[2] SCAN is a non-profit organization partially funded by DCS that provides services to family and children such as home-based case management and supervised visitation. *See SCAN's History & Evolution*, https://www.scanfw.org/history (last visited Sept. 11, 2015).

definitions and asked that she memorize ten of them. Wright testified that his therapy with Mother never progressed past this stage because she did not complete the assignment and was not otherwise engaged in the therapy. Wright also testified that Mother's attendance record was poor—she attended twenty-one out of forty-seven sessions—and that he did not believe she had benefitted from the services.

[11]   Mother's final individual therapist was Marla McQuinn, also from the Bowen Center. Mother began meeting with McQuinn in January 2014 and continued meeting with her until the time that her parental rights were terminated. McQuinn also attempted to use cognitive behavioral therapy with Mother. During sessions, the two would discuss Mother's distorted thinking. McQuinn testified that Mother attended all but one of their scheduled sessions; however, because the two had trouble determining what to work on, she did not believe that Mother had benefitted from her services.

[12]   Throughout this time, Mother was regularly visiting her children. However, on March 21, 2013, the trial court ordered that Mother not be allowed to visit N.G. until DCS and SCAN, who had been supervising the visits, deemed it to be appropriate. This order came as the result of an incident during a visit between Mother and N.G. in which Mother had asked N.G. to pick popcorn up from the floor. Tr. p. 620. N.G. became upset, ran out of the room, and told a SCAN employee that he did not want to see Mother anymore. *Id.* at 621. In the same order, the trial court also limited Mother's visitation with G.C., L.C., and M.C. to one time per month.

[13] Events took a drastic turn on July 3, 2013, when the trial court was forced to hold a detention hearing after Father was arrested for molesting one of Stepmother's children. At the time, the victim resided in Father's home alongside N.G., L.C, and M.C. Father was later convicted of four counts of child molesting and two counts of sexual misconduct with a minor and sentenced to a four-year executed term of imprisonment. Following his arrest, the trial court ordered the children removed from Father's home and placed in foster care. Following his placement in foster care, N.G. had to be hospitalized in Parkview Behavioral Health as a result of his volatile behavior.

[14] On October 7, 2013, DCS filed a proposed permanency plan in the trial court, recommending termination of Mother and Father's parental rights as to all of the children. The trial court issued an order, that: (1) changed the children's permanency plan to adoption; (2) continued the children's placement in foster care; and (3) authorized DCS to file a petition to terminate parental rights. The trial court also ordered that Stepmother be allowed to visit the children in accordance with the recommendation of the children's therapist.

[15] On July 24, 2013, DCS petitioned to terminate Mother's parental rights as to her oldest son, G.C. On March 14, 2014, Juvenile Court Judge Charles Pratt denied DCS's petition, concluding that termination of Mother's parental rights was not in G.C.'s best interests. Judge Pratt reasoned as follows:

> [DCS] must be able to demonstrate that permanency through adoption is preferable to permanency through foster care while reunification efforts continue. Of essential importance in determining the difference is the parent's willingness and positive steps a parent has made to

achieve reunification. Clearly [Mother] has not made the progress she needs to make to properly meet [G.C.'s] special needs. However, she has completed some of the services (e.g. parenting instruction) and she has not stopped or refused counseling services. [Mother] and [G.C.] love each other. Unlike his younger siblings, [G.C.] yearns to be returned to her care and has a bond with her. [G.C.'s] younger siblings refer to [Mother] in the third person and have demonstrated a clear pattern of agitation following visits.

State's Ex. 26. Judge Pratt determined that, in light of G.C.'s special needs, his love for Mother, and the ongoing likelihood that he would need therapy, it could not conclude that G.C.'s interests would be best served by termination of Mother's parental rights rather than simply continuing his placement in foster care. *Id.*

[16] Three days later, on March 17, 2014, DCS filed petitions to terminate Mother and Father's parental rights as to N.G., L.C., and M.C. This time, the case was heard by Magistrate Thomas Boyer. On May 21, 2014, prior to ruling on the petitions, the trial court suspended Mother's visits with L.C. and M.C. entirely. It reasoned that "[t]he behavior of [L.C.] and [M.C.] deteriorates immediately following visitation with [Mother]" and that, following the visits, L.C. and M.C. experienced "bedwetting, nightmares, agitation, and aggression." State's Ex. 24. Magistrate Boyer concluded that Mother's visitation significantly impaired L.C. and M.C.'s emotional development.

[17] On July 3, 2014, Mother submitted a subpoena duces tecum to Lisa Burton of SCAN for the production of documents and other things related to N.G., L.C., and M.C. Burton provided Mother with some documents but failed to provide

Mother with videotapes of several of the Children's therapy sessions. Mother and Father learned of the existence of the tapes during the termination hearing. Father orally moved to dismiss the case, arguing that the tapes could contain vital information relevant to his defense. Magistrate Boyer denied the motion. Eventually, Mother's counsel was able to view the tapes and to refer to the content of the tapes in her cross-examination of Burton.

[18] On December 12, 2014, Magistrate Boyer issued an order terminating the parent-child relationship between Mother and Father and N.G., L.C., and M.C.[3] Mother now appeals.

# Discussion and Decision

## I. Standard of Review

[19] The Fourteenth Amendment to the United States Constitution protects a parent's right to establish a home and raise her children. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009). Our Supreme Court has observed that "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). However, this right is not absolute and the interests of parents must be subordinated to those of their children when parents are unable

---

[3] Father does not appeal the termination of his parental rights.

or unwilling to meet the responsibilities that accompany this right. *Id.* at 1259-60.

[20] When reviewing the termination of parental rights, we do not reweigh the evidence or judge the credibility of the witnesses. *Id.* at 1260. We consider only the evidence and reasonable inferences drawn therefrom that are most favorable to the judgment. *Id.* As the trial court has entered findings of fact and conclusions of law in this case, we will apply a two-tiered standard of review. *Id.* We will determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id.* We will reverse the trial court's judgment only if it is clearly erroneous, meaning that the trial court's findings do not support its conclusions or its conclusions do not support its judgment. *Id.*

[21] Indiana Code section 31-35-2-4(b)(2) requires that a petition must allege:

> (A)     that one (1) of the following is true:
>
> > (i)     The child has been removed from the parent for at least six (6) months under a dispositional decree.
> >
> > (ii)     A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
> >
> > (iii)     The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the

child being alleged to be a child in need of services or a delinquent child;

(B)   that one (1) of the following is true:

(i)   There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)   There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)   that termination is in the best interests of the child; and

(D)   that there is a satisfactory plan for the care and treatment of the child.

DCS must prove these allegations by clear and convincing evidence. Ind. Code § 31-37-14-2.

# II.   Sufficiency of the Evidence

[22]   In its order, the trial court cited the same list of findings to support its conclusions that it was unlikely that the conditions that led to the children's removal were likely to be remedied and that termination of Mother's parental rights was in the children's best interests. The trial court relied on:

1.   [Mother's] history of verbal abuse towards [N.G., L.C., and M.C.].

2.   [Mother's] history of physical abuse to [N.G.].

3.   [Mother's] failure to protect [N.G.] from physical abuse by [Boyfriend].

4.   [Mother's] lack of compliance and progress in counseling.

5.      [Mother's] history of not taking her medications as prescribed.

6.      [Mother's] history of not taking [N.G.] to therapy on a consistent basis.

7.      [Mother's] history of not following medical advice from [N.G.'s] psychiatrist.

8.      [Mother's] inability to control and redirect the behavior of [N.G., L.C., and M.C.] during visitation.

9.      The negative behaviors exhibited by [N.G., L.C., and M.C.] immediately following visitation with [Mother].

10.      The emotional distress suffered by [N.G., L.C., and M.C.] as a result of contact with [Mother].

11.      The improvement in the behavior and mental health of [N.G., L.C., and M.C.] after visitation with [Mother] was suspended.

12.      The invalid test results from [Mother's] Child Abuse Potential Inventory in 2010 and 2012.

Appellant's App. p. 45. Mother argues that the evidence is insufficient to support several of these findings and that these findings do not support the trial court's judgment.[4] We reach different results as to the sufficiency of this evidence as it relates to L.C. and M.C. as opposed to N.G., and we discuss each in turn.

---

[4] Mother also argues that her due process rights were violated when the trial court refused to dismiss the case following revelations that Lisa Burton had not complied with a subpoena duces tecum. We note that, as Mother has not included the subpoena in the record, we cannot determine whether Burton failed to comply. In any event, Mother's counsel was given an opportunity to view the tapes and incorporate reference to their contents into her argument. This is not to say, however, that allegations that a third party who had possession of these tapes and knowledge of their existence blatantly disregarded a subpoena that Mother alleges called for their production should have caused the trial court no concern. If true, the trial court would be within its discretion to punish such actions as contempt. 17 Am. Jur. 2d Contempt § 124. While it is true that, due to the contents of the tapes, it might be appropriate to only allow counsel for the parents, and not the parents themselves, to view them, this does not mean that the appropriate course of action for one who has been served with such a subpoena is simply to ignore it.

## A. Termination of Mother's Relationship with L.C. and M.C.

### 1. The Conditions that Led to Removal

In determining whether the conditions that led to removal are not likely to be remedied, the trial court should judge a parent's fitness at the time of the termination hearing and consider any change in conditions since the removal. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007). The trial court can consider the services offered by DCS and the parent's response to those services. *In re D.J.*, 755 N.E.2d 679, 684 (Ind. Ct. App. 2001). "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d 204, 210 (Ind. Ct. App. 1999). However, "termination of parental rights cannot be based entirely upon conditions which existed in the past, but which no longer exist." *In re T.C.*, 630 N.E.2d 1368, 1374 (Ind. Ct. App. 1994).

The evidence presented as to Mother's relationship with L.C. and M.C. differs markedly from that presented in regard to her relationship with N.G. There is little, if any, evidence in the record regarding the state of Mother's relationship with L.C. and M.C. and her ability to care for them prior to their removal. L.C. and M.C. were removed along with N.G. after he was struck with a belt, but the trial court did not find, and DCS has never claimed, that L.C. and M.C. were the victims of physical abuse as well. The trial court makes only two

findings that relate to L.C. and M.C.'s home situation prior to their removal, citing Mother's "history of verbal abuse" towards her children and her "history of not taking her medications as prescribed." Appellant's App. p. 45.

[25] To begin, the trial court's finding that Mother has a history of verbally abusing the children finds no support in the record. Specifically, the trial court found that "[Mother] has a history of verbally abusing [the children], which was observed by [Father]." Appellant's Br. p. 41. Father testified extensively at the hearing and made no mention of having observed Mother verbally abusing the children.[5] Tr. p. 850-925. Furthermore, we can find no other evidence in the record establishing that Mother verbally abused the children.

[26] As for Mother's history of not taking her medications as prescribed, while this finding is supported by the record, it has little relevance here given the lack of evidence of any resulting consequence to L.C. and M.C. Although not taking prescribed medication is certainly not advisable, a trial court cannot simply assume that this fact counsels in favor of terminating parental rights without any evidence of a connection between a parent's failure to take the medication and a negative consequence to her children. Although a nexus could be

---

[5] We do not mean to imply that, had Father uttered the magic words "verbal abuse" while testifying, this would have been sufficient to support the trial court's finding. Adults frequently speak to children in a manner that would be considered inappropriate if used in conversation with other adults and we wish to make clear that parents need not fear that they will lose their children for having lost their temper and yelled. Were we to consider verbal abuse as a factor in determining whether parental rights should be terminated, the record would need to contain evidence describing that verbal abuse and its extent so that we could determine whether it reaches a level that would counsel in favor of termination.

inferred had there been evidence of negative consequences to L.C. and M.C., such consequences are not necessarily implied by Mother's failure to take her medication.

[27]    Furthermore, the trial court's finding on this point takes no account of Mother's recent history of regularly taking her medication. While the trial court found that up until 2013, Mother had not taken her medication as directed, it also found that between October 2013 and July 31, 2014, just before the commencement of the termination hearing, she had taken her medication as directed. Appellant's App. p. 38.

[28]    We note that when deciding whether there is a reasonable probability that the conditions that led to removal will not be remedied, a trial court must judge a parent's fitness to care for her children at the time of the termination hearing and take into consideration evidence of changed conditions. *In re D.K.*, 968 N.E.2d 792, 798 (Ind. Ct. App. 2012). With this in mind, while the trial court's findings regarding the distressing nature of Mother's past noncompliance with medication are supported by evidence, if the trial court wishes to use these findings to support the conclusion that the conditions that led to the children's removal are unlikely to change, it may not simply ignore its own findings as to Mother's recent improvement.

## 2. The Reasons for Placement Outside the Home

[29]    By requiring the State to establish a reasonable probability that "the conditions that resulted in the child's removal *or* the reasons for placement outside the

home of the parents will not be remedied," our termination statute makes clear that the trial court may consider the initial basis for removal *as well as* any basis resulting in a child's continued placement outside of the home in determining whether parental rights should be terminated. I.C. § 31-35-2-4(b)(2) (emphasis added); *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005). With regard to L.C. and M.C., the trial court focused almost exclusively on reasons for their continued placement outside of Mother's care, citing:

4.  [Mother's] lack of compliance and progress in counseling.

***

8.  [Mother's] inability to control and redirect the behavior of [N.G., L.C., and M.C.] during visitation.

9.  The negative behaviors exhibited by [N.G., L.C., and M.C.] immediately following visitation with [Mother].

10. The emotional distress suffered by [N.G., L.C., and M.C.] as a result of contact with [Mother].

11. The improvement in the behavior and mental health of [N.G., L.C., and M.C.] after visitation with [Mother] was suspended.

Appellant's App. p. 45.

## a. Progress in Counseling

[30] As for Mother's lack of compliance and progress in counseling, the evidence suggests that Mother had a mixed history of compliance that was steadily improving at the time of termination. Mother's latest counselor, Marla McQuinn, testified that Mother had attended all but one of their scheduled sessions. DCS acknowledges that Mother has regularly attended recent sessions, but argues that, even if Mother has been compliant, she has still failed

to make progress. It points out that McQuinn "questioned whether Mother was benefitting" from the services. Appellee's Br. p. 25. For its part, the trial court made three specific findings as to Mother's progress with cognitive behavioral therapy:

35. Marla McQuinn of the Bowen Center has been [Mother's] therapist since January 24, 2014. [Mother's] attendance and participation in therapy has improved since she has been working with Ms. McQuinn.

36. Ms. McQuinn is uncertain of whether [Mother] is benefitting from cognitive behavioral therapy. [Mother] still demonstrates closed thinking patterns and distortion in her perception of events.

37. [Mother] has been involved in cognitive behavioral therapy for over (2) years with little or no benefit or improvement in her thinking patterns. As noted by Dr. Lombard in his testimony there should be some signs of improvement after three (3) to six (6) months of participation in cognitive behavioral therapy.

Appellant's App. p. 38. Mother challenges the accuracy of findings #36 and #37.

[31] We agree with Mother that the evidence does not support these findings. Particularly, the trial court's finding that "[Mother] still demonstrates closed thinking patterns and distortion in her perception of events" is not supported by clear and convincing evidence. *Id.* The trial court apparently bases this finding on portions of McQuinn's testimony where she discussed alleged differences between Mother's perception of events that took place during supervised visits with the children and SCAN employees' perceptions of those same events.

McQuinn testified to two examples of these "cognitive distortions," the first of which she described as follows:

> Counsel: Okay. So what exactly did you work on with [Mother] in C.B.T.? [cognitive behavioral therapy]
>
> McQuinn: Well, the request was made that we work on cognitive distortions, and I needed clarification on what those were. And we have family team service provider meetings with other service providers [such as SCAN], and it would be discussed as far, you know, how the visits were going, things that happened, and, you know, how the service providers kind of felt those were going and then, you know, how [Mother] felt those were going.
>
> Counsel: Okay. Now, what—can you—real—we're gonna be specific now: What type of distorted thoughts are you specifically referencing?
>
> McQuinn: One example is that they were saying that she brought unsealed food to the visit, it sounded like they felt she did that more than one (1) time and, you know, those were things—like I would address that in session with her and just say, you know, "Let's talk about, you know— this is what they're seeing." And she would— she stated that she only brought, you know, unsealed food, like that only happened one (1) time.

Tr. p. 71-72.

[32] We pause to note that, even were it true that Mother was mistaken about how many times she brought unsealed food to a visit with the children, we believe that, although this may technically qualify as a cognitive distortion, it would be so trivial as to lend no support to the trial court's overall conclusion in this

case.[6]  But more importantly, there is no evidence in the record that Mother was actually wrong about how many times she brought unsealed food. Consequently, there is no evidence that this triviality was even a cognitive distortion in the first place.  McQuinn testified that she had been given different versions of events related to the unsealed food and that she could not tell which was correct.  *Id.* at 105.

[33]  McQuinn's next, and final, example of Mother's cognitive distortions also cannot be taken seriously:

> Counsel:   What other perceptions or distorted thoughts did you work on with [Mother]?
>
> McQuinn:   One of the other examples was that she, during a visit, would tell the girls that she was their mother, she would cradle their face.  Service providers didn't feel like that was appropriate.  And, you know, her perception is she was trying, I think, to express that she is their mother, but I—you know, I don't know, I wasn't there.

*Id.* at 74.  We wish to take this opportunity to make clear that a mother cradling her daughters' faces and telling them that she is their mother is not evidence of a mental health issue.  We are at a loss as to why SCAN would find this behavior inappropriate.  As a final note, and most tellingly, we observe that when asked if she felt as though she had been given clear direction from DCS

---

[6] We do not mean to suggest that Mother's failure to comply with a service provider's rules would be a trivial matter.  We merely observe that a disagreement over the exact number of times Mother had broken a particular rule is trivial when considering the state of Mother's mental health.  Even if Mother were mistaken, we would hope that a commonplace mistake such as this would be viewed with empathy lest we all be deemed unfit to raise children.

about what services to provide to Mother, McQuinn responded: "Not really." *Id.* at 103. We cannot be surprised that Mother had not reached the level of improvement anticipated if DCS had not clearly indicated to the service provider what that level was.

[34] In short, the trial court found that Mother "still demonstrates closed thinking patterns and distortion in her perception of events" because she had a disagreement with SCAN employees, which remains unresolved, and because she told her own children that she was their mother. Appellant's App. p. 38. It is self-evident that the trial court's finding on this point is not supported by clear and convincing evidence. And it therefore follows that the trial court's next finding, that there has been little or no improvement in Mother's thinking patterns, is based on insufficient evidence as well. *Id*.

## b. L.C. and M.C.'s Behavior During and Following Visits

[35] We are left with L.C. and M.C.'s poor behavior during and following visits as the sole basis for the trial court's finding that the reason for their placement outside Mother's home will not be remedied. Mother attended supervised visits with L.C. and M.C. from the time they were removed from her care in August 2011 until the trial court ordered a cessation of visits in May 2014. The visits were held at SCAN as well as Dr. Lombard's office and supervised by five different individuals who testified at Mother's termination hearing.

[36]    Joyce Spieth supervised these visits from September 2011 to approximately May 2012. At this time, Mother was allowed to visit all four of the children on a bi-weekly basis. Spieth testified that Mother behaved appropriately during the visits, that she appeared to share a bond with the children, and that the children referred to Mother as "mommy." Tr. p. 726-27. Spieth also testified that Mother was able to manage the children during visitation and that she had no concern as to Mother's ability to parent. *Id.* at 731.

[37]    From May 2012 to October 2013, visits were held in Dr. Lombard's office. Throughout this time, Dr. Lombard personally observed only one of the visits.[7] As to Mother's interaction with the children, Dr. Lombard testified that "[t]he children wanted to talk to her, wanted to do activities with her, wanted to interact with her, so they seemed comfortable with her, wanting to engage, so there seemed to be a bond with the children and the mother." *Id.* at 552.

[38]    Ashlee Rager of SCAN supervised the visits from November 2012 through June 2013. Rager testified that Mother would come prepared for the visits and that she and the children would watch movies, play board games, and occasionally make crafts that Mother had brought for them. *Id.* at 616. Rager observed L.C. and M.C. had an emotional attachment to their Mother and that they would engage in activities with her and hug her. *Id.* at 628.

---

[7] The other visits were observed by a staff member at Dr. Lombard's office who did not testify at the hearing. Tr. p. 543-44.

As to discipline, Rager testified that Mother "had set up different techniques" and "had brought in a paper once, kind of outlining rules and guidelines that she wanted the kids to follow, and had kind of like a meeting with all the kids to discuss that." *Id.* at 618. Rager testified that Mother's discipline techniques were not always effective and that sometimes the children were not obedient. Rager described some portions of the visits as "chaotic," noting that when Mother would attempt to have all the children sit down together as a family "the kids would not settle down to do family as a group or they would be off doing their own things during the visit." *Id.* at 619.

On March 21, 2013, on Rager's recommendation, the trial court suspended visitation between Mother and N.G. entirely, and restricted Mother's visitation with L.C., M.C., and G.C. to one time per month. Rager explained the reason for her recommendation as follows:

> This visitation had occurred, there was an incident in which [N.G] and [G.C.] were both asked to pick up, they had thrown some popcorn on the floor. [N.G.] would not go over and pick up like he was supposed to, so [Mother] kind of got close to him, kind of in his boundary, in his space, and didn't form a boundary with him; and he got angry and ran out of the room at that time. When he ran out, we were in the SCAN waiting room, which is directly off of that office. The receptionist was sitting there and [N.G.] ran straight to [Father] and [Stepmother], who were sitting in the waiting room, and said that he no longer wanted to have visitations with his mom and that he did not want to see her. A therapist, another SCAN therapist, came out who had been down the hall to see what was going on, was trying to comfort [N.G.], and then once he walked out . . . I believe he walked out the door with [Stepmother], I don't know that a hundred percent sure, I don't recall; but [Mother] then came back into the room and said that she was just

trying to discipline him and to get him to do what he was supposed to do and follow the directions.

*Id.* at 620-21.[8]

[41] Rager went on to testify that she had recommended that visitation between Mother and her other three children be restricted to one time per month because of what she viewed as the general chaos of the visits—citing an incident where Mother had attempted unsuccessfully to put M.C. in a time-out. *Id.* at 623. Rager noted that around this time, L.C. and M.C. would refer to Mother by her first name and refer to Stepmother as "mom." *Id.* at 625-28.

[42] Kenneth Shields was the next to supervise the visits, meeting with Mother and L.C. and M.C. between July 2013 and February 2014. This period immediately followed Father's incarceration and L.C. and M.C.'s removal from his care and placement in foster care. DCS relies heavily on Shields's testimony to support its contention that Mother exhibited inappropriate behavior during visits with the children. Appellee's Br. p. 8.

[43] In particular, Shields testified that "in relation to [G.C.] asking about a future visit . . . [Mother] had made the comment, you know, if the Court granted another visit." Tr. p. 326. Focusing on Mother's use of the word "if," Shields

---

[8] The record contains other evidence of N.G.'s proclivity for fleeing from rooms to avoid discipline. N.G.'s therapist, Lynn Baker, testified to having observed N.G. head-butt his parents during a therapy session and then attempt to run out of the room. Tr. p. 194. Baker had to block the door with her chair to prevent his escape, which she deemed an appropriate response given the circumstances. *Id.* Similarly, Mother testified to having attempted to block the door to prevent N.G.'s escape during the above-described incident, however, she maintains that Rager instructed her to move out of the way. *Id.* at 976-77.

concluded that such conditional language was inappropriate as "it seemed that it would leave the kids in the tenuous position of whether they would get to see their mother or not again." *Id.* Shields also noted an incident in which L.C. and M.C. informed Mother that they had visited Stepmother at some point after their removal from Stepmother's care. Mother wondered aloud whether such visits were authorized and asked Shields if they had occurred. Shields also believed this to be inappropriate. *Id.* at 326-27. Finally, he noted that Mother would occasionally whisper to the children, which was against SCAN policy. *Id.* at 340-41.

[44] As for Mother's interaction with L.C. and M.C. during the visits, Shields testified:

> It was typical during the visits for [Mother] to always bring a lot of stuff, usually gifts or clothing or food and that sort of thing, so the kids would become very excited . . . excitable at that point, it would kind of escalate their behavior. And when the girls would get overexcited like that, she would . . . she would do her best to try to distract them by, you know, saying, "Let's all line up like ducks" was one example of what she had done at one point. And then it would . . . at that time, she would say "I'm gonna put you in time out if you can't . . . you know, if you don't settle down."

*Id.* at 327. Shields testified that when Mother warned L.C. and M.C. that they were going to be put in time-out, their behavior would "not always" change and that Mother often failed to follow through by actually putting L.C. and M.C. in time-out if they continued to misbehave. *Id.* at 360. Shields testified that he could have helped Mother work on effective modes of discipline but he did not do so because Mother never asked. *Id.* at 338-39.

Lisa Burton, also of SCAN, began meeting with L.C. and M.C. individually in January 2014. She observed one visit between Mother and L.C. and M.C. in February 2014. As to Mother's behavior during the visit, Burton testified that "[h]er behavior, her appearance, her timeliness, all of that was perfectly appropriate." *Id.* at 760. However, Burton noted that "[w]hat was inappropriate was the girls' reaction." *Id.* Burton noted that L.C. and M.C. got up on the table on several occasions and that—in the month or so that she had known them—she had never seen them behave in that fashion. Burton also noted Mother's insistence that L.C. and M.C. not refer to anyone else as their mother.

Burton also observed L.C. and M.C.'s behavior when she conducted therapy sessions with the girls following the visits with Mother. Burton testified that L.C. and M.C. "would go home in tears, they were wetting the bed, they were having nightmares, and so we did almost a debriefing kind of session afterward." *Id.* at 769. However, Burton also testified to having observed very similar behavior from L.C. and M.C. following a visit with someone other than Mother. *Id.* at 747.

In March of 2014, Burton requested that visits between Mother and L.C. and M.C. be suspended entirely. Burton explained that:

> At this point, we had several months of documentation of explosive
> behavior from them and no indication of their interest, need, or desire
> to have contact with biological parents; so I requested that we suspend
> it and see if there was any change in both that . . . the negative
> behavior, as well as if there would be an increase in requesting in the

> absence, if there would be, after a pause, perhaps an ability to refresh, trust, and a desire to build a relationship at that point. Sometimes a little time and a little break can be helpful.

*Id.* at 776. Following this recommendation, the trial court suspended all visitation in May 2014 and visitation never resumed prior to Mother's parental rights being terminated. Burton noted an improvement in L.C. and M.C.'s behavior following cessation of the visits. *Id.* at 777.

[48] Viewed in its totality, this evidence indicates that Mother has a substantial history of coming to visits prepared and behaving appropriately. Though DCS tries its best to highlight the instances in which Mother failed to comply with the rules laid out by supervisors, these infractions are minor—involving things such as whispering to the children and an allegedly improper use of the word "if." And the record indicates that when warned about these infractions, Mother would comply with the service provider's wishes. *Id.* at 631. This behavior pales in comparison to other instances where we have determined that a parent's behavior during visitation and actions towards service providers counselled in favor of termination. *See In re A.H.*, 832 N.E.2d 563, 566 (Ind. Ct. App. 2005) (father displayed a complete lack of ability to control his anger during visitations, became combative and angry with service providers, and threatened to bomb the office of family and children).

[49] This evidence also reflects that after nearly three years of being kept outside of Mother's care, L.C. and M.C.'s relationship with Mother has deteriorated. However, the evidence sheds little light on whether this deterioration is

attributable to Mother. The trial court did not find that L.C. and M.C.'s behavior came as a result of Mother's actions or that she was otherwise responsible for the children's reactions. And we do not believe such a finding would have been supported by this evidence had it been made. Because a decline in the quality of the relationship between Mother and her children was a foreseeable consequence of affording Mother such limited contact, were we to use this as the sole basis for terminating her parental rights absent a showing of significant responsibility on her part, we would be paying little more than lip service to Mother's constitutional right to raise her children.

## c. L.C. and M.C.'s Best Interests

We acknowledge that L.C. and M.C. have suffered as a result of the tumultuous events of the past few years and we do not doubt that the children could benefit from stability. However, the law of this State manifests a clear preference for the reunification of families. Indiana Code section 31-34-21-5.5 requires DCS to "make reasonable efforts to preserve and unify families." It goes without saying that children who have been removed from their mother's care for a number of years may grow less attached to her. This is perhaps one reason why, when a child has been removed from a home, DCS is directed "to make it possible for the child to return safely to the child's home as soon as possible." I.C. § 31-34-21-5.5.

The children have been removed from Mother's home since 2011 because N.G. had been subjected to physical abuse. However, there is no evidence in the

record indicating that L.C. and M.C. were subjected to this abuse and DCS does not allege that a return to Mother's care would jeopardize L.C. and M.C.'s physical safety. Furthermore, the evidence suggests that Mother now maintains stable housing, which is kept in a clean and orderly manner, that she has been taking her prescribed medication, that she has regularly attended her therapy sessions, and that she has otherwise complied with the requirements of her parent participation plan.

[52] DCS's case in support of termination in regard to L.C. and M.C. rests entirely on the premise that the children suffer emotionally as a result of contact with Mother. However, as previously discussed, the evidence does not indicate that L.C. and M.C.'s negative reactions towards Mother are anything other than the foreseeable consequence of years of separation with limited contact. In sum, the evidence in the record does not support the conclusion that L.C. and M.C.'s best interests would be served by terminating their relationship with their Mother.[9] Therefore, we reverse the portion of the termination order relating to L.C. and M.C.

## B. Termination of Mother's Relationship with N.G.

[53] While many of the trial court's findings that purport to relate to all three children are not supported by the evidence, this is not the case regarding the

---

[9] For these same reasons we find that the evidence in the record does not support a conclusion that continuation of the parent-child relationship between L.C. and M.C. and Mother poses a threat to the well-being of the children. I.C. § 31-35-2-4(b)(2)(B).

numerous findings that relate specifically to N.G. We believe that these findings, viewed in light of the evidence most favorable to them, compel us to affirm the trial court's decision to terminate Mother's parental rights as to N.G., given our highly deferential standard of review.

[54] The evidence makes clear that Mother has had a particularly difficult time parenting N.G. N.G. has been seeing therapists since he was three years old and has been diagnosed with attention deficit hyperactivity disorder as well as oppositional defiant disorder. Appellee's Br. p. 10. Mother complained that N.G. behaved aggressively and could not be managed in any setting. In 2012, Dr. Ahmad, one of N.G.'s psychiatrists, noted his concern over Mother's ability to care for N.G. State's Ex. 43. Dr. Ahmad noted that Mother had sought to have N.G. admitted to the hospital on many occasions, which Dr. Ahmad deemed unnecessary and inappropriate. *Id.* At the time N.G. was removed from Mother's care, he had been prescribed eight different medications.

[55] The trial court also found that Mother had a history of physically abusing N.G.[10] In 2009, DCS substantiated a report that Mother had physically abused N.G., apparently by hitting him with a dowel rod. Tr. p. 898. Two years later,

---

[10] Though our CHINS statute provides that it shall not be construed to "limit the right of a parent, guardian, or custodian of a child to use reasonable corporal punishment when disciplining a child," Mother has never argued that her actions were reasonable or intended as a punishment. I.C. § 31-34-1-15; *See Willis v. State*, 888 N.E.2d 177, 183 (Ind. 2008) (parent's use of a belt or extension cord to strike her son five to seven times on the buttocks held to be reasonable corporal punishment when it was reasonably necessary and appropriate to compel obedience to Mother's insistence that her son tell the truth).

while N.G. was in Mother's care, Boyfriend hit N.G. with a belt, which led to the removal of all three children and the commencement of this case.[11]

[56] Lynn Baker, a mental health therapist who has worked with N.G. for years, testified to her belief that N.G.'s memories of this physical abuse played a significant role in his continued negative behavior. *Id.* at 178. Baker testified as to N.G.'s aggressive behavior during therapy sessions, which involved head-butting his parents, trying to destroy things in her office, and trying to open the door and run from the building. Baker believed that N.G. had lost the ability to trust that he was safe with Mother. *Id.* at 182. Baker also testified that Mother had a poor record of bringing N.G. to therapy sessions consistently. *Id.* at 172.

[57] Given Mother's past inability to control N.G.'s behavior coupled with her history of resorting to physical abuse, we believe the trial court could infer that the circumstances would remain unchanged if N.G. were returned to her care. Although Mother has a recent history of taking her medication and a recent history of complying fully with the services provided her, we believe that given the evidence of Mother's lengthy troubled relationship with N.G., the trial court was within its discretion to determine that the conditions that led to his removal were unlikely to change.

---

[11] There is contradictory evidence in the record regarding whether Mother or Boyfriend hit N.G. with the belt in 2011. We note that the trial court did not find that it was Mother who struck N.G., but instead found that Mother had failed "to protect [N.G.] from physical abuse by [Boyfriend]." Appellant's App. p. 45.

Furthermore, given N.G.'s special needs, we also believe that the trial court could have concluded that termination was in his best interests. The evidence indicates that N.G. is in need of continuing therapy and medication. Mother's history of not taking N.G. to therapy sessions could allow the trial court to conclude that his needs would not be met were he returned to Mother's care.

# Conclusion

We have long observed that the "parent-child relationship is one of the most valued relationships in our culture." *In re D.L.M.*, 725 N.E.2d 981, 983 (Ind. Ct. App. 2000). The State has authority to interfere with this relationship only in certain limited circumstances. *In re L.S.*, 717 N.E.2d at 208. As the involuntary termination of parental rights severs all rights of a parent to her children, we recognize that it is "the most extreme sanction a court can impose" and "is intended only as a last resort, available when all other reasonable efforts have failed." *Id.*

Accordingly, when the State seeks to terminate the relationship between a parent and her child, the parent has an extremely important interest in the accuracy and justice of such a decision. *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 31 (1981). This is why the State is required to prove its case by clear and convincing evidence, a heightened standard applied in cases, such as this, "where the wisdom of experience has demonstrated the need for greater certainty." *In re G.Y.*, 904 N.E.2d at 1260 n.1 (quotations omitted).

The evidence presented in regard to L.C. and M.C. falls far short of meeting this standard. At the end of the day, we cannot say with any confidence that the conditions that led to L.C. and M.C.'s removal will not be remedied—in part because we cannot determine what those conditions were—nor can we be at all certain that termination is in the children's best interests. Given the gravity and permanence of the sanction, such certainty is required in termination cases.

We reach a different conclusion in regard to N.G. in light of the evidence in the record regarding his special needs and instances of physical abuse.

The judgment of the trial court is affirmed in part and reversed in part.

Bailey, J., concurs, and Mathias, J., concurs in part and dissents in part with a separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of:

N.G., L.C., and M.C. (Minor Children),

and

A.C. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

Court of Appeals Case No.
02A04-1412-JT-605

**Mathias, Judge, concurring in part and dissenting in part.**

[64] I concur in the majority's decision affirming termination of Mother's parental rights to N.G., but I respectfully dissent from my colleagues' conclusion that the trial court's judgment terminating Mother's parental rights to L.C., and M.C. is not supported by sufficient evidence. Although termination of Mother's

parental rights to L.C. and M.C. might be a close call, given the well-established deference our court is required to give to trial courts in these matters, I would affirm the trial court in all respects.

[65] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). In deference to the trial court's unique position to assess the evidence in the context of its repeated contacts with Mother and her service providers, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which "leaves us with a definite and firm conviction that a mistake has been made." *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

[66] The children were removed from Mother's care in 2011 for a litany of very good reasons. Whether by Mother or by her boyfriend, N.G. had been struck by a belt with metal prongs that caused cuts and bruising. Mother also had a previous substantiated case of physical abuse toward N.G. Mother is bipolar, and at the time she was decompensating, or not taking her prescribed medications, and she was non-compliant with ordered services. In addition, she continued to maintain a relationship with the man who she alleged struck N.G. with the belt and who had threatened to kill her. Ex. Vol., State's Ex. 5. DCS also believed that Mother was possibly a hypochondriac, and the children had seen several physicians. Father alleged that Mother verbally abused the children and had numerous old medications that she dispensed to them. In light of volume and seriousness of these allegations, it was reasonable for the court to

infer that Mother's failure to take her medication, and the fact that she physically abused N.G., resulted in a volatile and unstable home environment causing numerous behavioral issues in the children, which were discussed at length in these proceedings.

[67] Although the facts in the record are a bit less stark than those supporting termination of parental rights to N.G., I believe the evidence is nonetheless sufficient for termination.

[68] The twins, who were eight-years-old on the date the termination judgment was issued, were five-years-old when they were removed from Mother's care. L.C. and M.C.'s therapist observed that "they both clearly have trauma processing and anger management issues and concerns." Tr. p. 779. When the twins are fearful of a person or experience, "their reactions are far more extreme . . . . They become so physically and emotionally worked up that there's crying, there's wetting, there's screaming, there's shaking. It is a very physical and emotional reaction." Tr. p. 780. Also, the twins' therapist believes that because the twins have the ability to attach to and trust other adults in their life, such as teachers and their foster parent, L.C. and M.C.'s refusal to talk about Mother and their negative reaction when Mother is discussed with them is "clinically significant."[12] Tr. pp. 784, 787-89. Therefore, their therapist concluded that the

---

[12] Given this evidence, I strongly disagree with the majority's conclusion that "the evidence does not indicate that L.C. and M.C.'s negative reactions towards Mother are anything other than the foreseeable consequence of years of separation with limited contact." *See* Slip op at 29.

twins do not "feel safe and healthy or interested in" Mother. Tr. p. 790. From this evidence, it is reasonable to infer that the twins suffered emotional harm while in Mother's care.

[69] As noted by the majority, on the date of the termination hearings, Mother had a stable home, was married, and her husband, who also has a daughter, was gainfully employed. Mother had also consistently taken her medication for her bipolar disorder for over six months prior to the hearings. These were good developments in Mother's life. *See In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010) (stating that to determine whether the conditions that led to a child's removal will not be remedied, the juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing). Mother also had a history of positive supervised visitation with the twins.

[70] The juvenile court considered Mother's recent stability but also appropriately weighed Mother's recent improvements against her history of decompensating, or failing to take her medication. *See id.* (stating the juvenile court's inquiry must also evaluate a parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child). DCS presented evidence that without proper medication, "it is unlikely that [Mother] will be able to maintain a sense of stability in her personal, work, or social life." Ex. Vol., Petitioner's Ex. 41. Also, Mother failed to benefit from therapy. *See e.g.* Tr. pp. 49-50 (stating that Mother did not benefit from therapy and cancelled numerous appointments); Tr. p. 77 (stating that Mother's sense of reality is different from the service providers); Tr. p. 412 (concluding that Mother has

poor coping skills); Tr. pp. 1016, 1077 (stating that after three years of services, Mother failed to successfully complete services and benefit from therapy). Mother's current therapist testified that it is difficult to work with Mother in therapy because Mother's version of reality is significantly different from the reports the therapist receives from Mother's service providers.

[71] When this evidence is considered under our highly deferential standard of review, I would conclude that DCS presented clear and convincing evidence that the conditions that resulted in the children's removal from Mother's care will not be remedied because 1) we may reasonably infer that the twins suffered damaging emotional harm while in Mother's care, and continued to suffer emotionally throughout these proceedings; 2) Mother lacks insight with respect to her mental health and behavior issues; 3) Mother failed to benefit from therapy and take responsibility for the harm she caused her children; and 4) Mother has historically been unable to take her prescribed medication consistently to treat her bipolar disorder. *See In re M.S.*, 898 N.E.2d 307, 311 (Ind. Ct. App. 2008); *McBride v. Monroe Cnty*. OFC, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003) (stating that the juvenile court may properly consider a parent's history of neglect and her response to services offered by the DCS to determine whether the conditions that led to the children's removal will be remedied). Sadly, all of these proven facts lead me to conclude that the emotional distress suffered by L.C. and M.C. combined with Mother's failure to take her medication for bipolar disorder irreparably harmed the parent-child relationship, particularly because Mother failed to consistently engage in and

complete services provided to her during the first two years of the CHINS proceedings.

[72] Similarly, I would also conclude that termination of Mother's parental rights was in the children's best interests. In determining what is in a child's best interests, the trial court must look to the totality of the evidence. *See A.D.S. v. Ind. Dep't of Child Servs.*, 987 N .E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. "In so doing, the trial court must subordinate the interests of the parent to those of the child." *Id*. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id*.

[73] The twins exhibited numerous behavioral problems throughout these proceedings, including bed-wetting, inability to sleep, defiant behavior, impulsiveness, and trouble in school. Mother failed to provide a stable home for the children, and the children have been removed from her care for over three years. These children require stability, and a safe and healthy home environment. Mother's poor coping skills, inability to benefit from therapy, and historical medication non-compliance lead me to conclude that Mother has not demonstrated that she will be able to provide a safe and stable home for the twins for any significant length of time.

[74] Moreover, after M.C.'s and L.C.'s visitation with Mother ceased, M.C. stopped wetting the bed, the twins' behavior improved both at school and in the foster home, their sleep habits improved, and the number of nightmares decreased. Tr. pp. 774, 777, 794. Finally, many service providers testified that termination

of Mother's parental rights was in the children's best interests. *See e.g.* Tr. pp. 144, 780, 1093.

[75] For all of these reasons, I conclude that clear and convincing evidence supports the trial court's determination that termination of Mother's parental rights is in L.C.'s and M.C.'s best interests. *See In re A.I.*, 825 N.E.2d 798 (Ind. Ct. App. 2005) (testimony of caseworkers, together with evidence that the conditions resulting in placement outside the home will not be remedied, was sufficient to prove by clear and convincing evidence that termination was in child's best interests), *trans. denied; see also In re S.P.H.*, 806 N.E.2d 874, 883 (Ind. Ct. App. 2004) (children's needs are too substantial to force them to wait while determining if their parents will be able to parent them).